IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

ARBIE V. ARBIE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

ANDREA V. ARBIE, APPELLEE AND CROSS-APPELLANT,

V.

PHILLIP S. ARBIE, APPELLANT AND CROSS-APPELLEE.

Filed August 18, 2020.    No. A-19-962.

Appeal from the District Court for Lancaster County: LORI A. MARET, Judge. Affirmed.

Stephanie R. Hupp, of McHenry, Haszard, Roth, Hupp, Burkholder & Blomenberg, P.C., for appellant.

David P. Kyker for appellee.

MOORE, Chief Judge, and BISHOP and WELCH, Judges.

MOORE, Chief Judge.

## INTRODUCTION

Phillip S. Arbie appeals from a decree entered by the District Court for Lancaster County, dissolving his marriage to Andrea V. Arbie. Phillip challenges the court's determination, valuation, and division of the marital estate; the child support assessed against him; and the temporary spousal support awarded to Andrea. On cross-appeal, Andrea challenges the court's receipt of appraisal evidence regarding the parties' residence, and the failure to award her permanent alimony. For the reasons that follow, we affirm.

## FACTUAL BACKGROUND

Andrea and Phillip were married on August 26, 2006. Two children were born during the marriage. On February 16, 2018, Andrea petitioned for dissolution of the marriage. On March 27, the court entered an order granting temporary custody of the children to Andrea and requiring

Phillip to pay $1,663 per month in child support. Phillip was awarded parenting time on a "10/4" schedule set forth in a parenting plan. The court also entered a nonhypothecation order against both parties and granted Andrea exclusive possession of the marital home. On April 10, the court entered a temporary order for spousal support in the amount of $900.00 per month beginning May 1 and continuing until further order of the court.

On October 25, 2018, Phillip filed a motion to temporarily reduce his child support and temporary spousal support obligations, alleging that he lost his job and, despite his diligent efforts, he had not yet been able to obtain new employment. No order was entered by the district court on this motion prior to trial.

Trial was held on January 23, 2019, and continued to January 25 and February 15. The following evidence was heard at trial.

At the time of the divorce filing, Phillip was employed by Fiserv, a technology company serving the financial industry, as a technology sales consultant. His most recent earnings averaged $13,177 per month, and he earned an average of $104,000 per year over the last 5 years. However, in September 2018, Phillip negotiated an agreement with his supervisor allowing him to voluntarily resign in lieu of a termination by Fiserv. According to Phillip, his job was in jeopardy due to a failure to meet the requisite sales quota after some potential sales fell through. Phillip felt that resignation was more dignified and would be beneficial in obtaining new employment. Phillip has since been searching for employment with similar compensation to what he was earning at Fiserv, without success. Phillip's job search has involved sending out resumes, networking, making contacts, and going on job interviews. He indicated that he has sent out 26 applications to various companies and he was hopeful that he would secure comparable employment. However, it was taking longer for Phillip to find comparable employment than he anticipated due to the competitive market. While Phillip continues to search for employment, he drives for Uber earning approximately $1,500 per month. Prior to working at Fiserv, Phillip worked in banking and as a finance director. His earnings from 2004 through 2017 fluctuated between $16,779 and $150,000 per year, with a 16-year average of $76,363.81 per year. Since being unemployed, Phillip has relied upon his Uber earnings and "what little" savings was available to him to meet his expenses. He has continued to pay for health insurance for the family under the "COBRA" plan, which has cost between $1,660 and $1,800 per month. At the time of trial, Phillip was in arrears in his child support and spousal support in the total sum of $6,252. Phillip submitted an exhibit showing his monthly expenses totaling $3,872. Phillip was asking the court to reduce his child support retroactively until he finds new employment at which time child support could be reset. Phillip also asked the court to suspend his alimony payment obligation retroactively to November 1, 2018, until he is able to obtain new, comparable employment.

Andrea is self-employed as an independent consultant for Arbonne, operating under an S corporation, which business provides an income average of $7,083 per month. Andrea testified that her income could fluctuate $20,000-$30,000 from year-to-year. Andrea submitted an exhibit showing her monthly expenses totaling $6,746.25.

Prior to the marriage, in 1999, Phillip purchased a condominium in Maricopa County, Arizona. Phillip testified that he thought the purchase price was $145,000. Phillip didn't remember the exact value of the downpayment made, but estimated that it may have been about $14,500 or less. Phillip offered a mortgage loan history document, which shows a beginning balance of

$110,010 as well as the payments made on the loan. This document contains handwritten notes on the top of the first page which note a purchase price of $139,000, a downpayment of $20,000, and improvements of $12,000. According to the mortgage loan document, Phillip paid $12,596.05 toward the mortgage on the condominium prior to the parties' marriage. Phillip also testified that he made approximately $15,000 worth of repairs and upgrades to the condominium prior to the marriage, including putting in travertine stone, and updating the appliances and bathrooms. After the parties were married, they spent approximately 5 months living in the condominium. Shortly after their marriage, in November 2016, the parties refinanced the condominium and both of their names were placed on the deed and note. Phillip testified that the purpose of refinancing the condominium was to help Andrea build her credit. Andrea testified that she made the mortgage payments on the condominium during the first 7 months of their marriage when Phillip was not working. In 2012, the property was again refinanced solely in Phillip's name and Andrea executed a quitclaim deed, transferring her interest in the condominium to Phillip.

In 2016, at Andrea's request, Phillip executed a special warranty deed conveying his interest in the Arizona condominium to himself and Andrea as community property with right of survivorship. According to Phillip, this was done purely for estate planning purposes. According to Andrea, she brought to Phillip's attention that not having her name on the deed could cause problems "in probate." Andrea testified that Phillip represented to her that the Arizona condominium would always be marital property, and they always treated it as part of their "overall balance sheet." Andrea stopped contributing to her retirement account on the belief that the condominium would always be available for their future. During the majority of the marriage, the condominium was occupied by various tenants and the rents from those tenants were deposited into an account used to pay the mortgage for the condominium. During the course of the marriage, payments totaling $20,419.85 were made toward the mortgage on the condominium. At the time of trial, Phillip indicated that he received approximately $100 per month in rental income above the mortgage payment.

The parties also own a marital residence in Lincoln, Nebraska, where Andrea was living at the time of trial. Andrea used the 2019 preliminary value from the Lancaster County assessor and information from two real estate agents to determine that the value of the marital home is $241,000. Phillip estimated the value of the residence to be $280,000. He offered a screenshot showing an online estimate of $274,956 from the real estate company, Zillow, and an Exterior-Only Inspection Residential Appraisal Report from an appraiser, which valued the residence at $265,000.

The decree of dissolution was filed on August 23, 2019. The parties were awarded joint legal custody, with Andrea receiving their physical custody, subject to Phillip's reasonable and liberal parenting time set forth in the attached parenting plan. Phillip was ordered to pay $1,663 in monthly child support for two children and $1,188 per month when there is only one minor child remaining. Neither party was awarded alimony. The court awarded the marital residence to Andrea, assigning the property the fair market value of $241,000. Phillip was awarded the Arizona condominium, which was assigned a fair market value of $240,000. The court found that Phillip failed to meet his burden of proving that the Arizona property was nonmarital. The court divided the remaining marital estate such that the net division was nearly equal.

Phillip timely filed a motion to alter or amend the judgment, asking the court to expressly consider the issues raised in his motion to temporarily reduce child support and alimony, "which

the Court had indicated would be addressed at trial during the hearing on said Motion held on November 30, 2018." On November 4, 2019, the court entered an order overruling the motion. Phillip appeals, and Andrea cross-appeals.

## ASSIGNMENTS OF ERROR

Phillip assigns that the district court erred by (1) finding that the Arizona condominium was marital property, (2) determining the value of the marital residence, (3) failing to award an equalization judgment based on the foregoing errors, (4) the assessment of child support against him, and (5) the assessment of temporary spousal support against him. On cross-appeal, Andrea assigns that the district court erred in receiving Phillip's appraisal evidence on the marital residence and in failing to award her permanent alimony.

## STANDARD OF REVIEW

In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Blank v. Blank*, 303 Neb. 602, 930 N.W.2d 523 (2019). A judicial abuse of discretion exists when reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id*. When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

## ANALYSIS

### ARIZONA CONDOMINIUM AS MARITAL PROPERTY

Phillip first argues that the district court erred in holding that the Arizona condominium was marital property. It is well settled that under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process. *White v. White*, 304 Neb. 945, 937 N.W.2d 838 (2020). The first step in the equitable division of property is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. *Id*. The second step in the equitable division of property is to value the marital assets and marital liabilities of the parties. *Id*. The third step in the equitable division of property is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *White v. White, supra*. The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. *Id*.

Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Rohde v. Rohde,* 303 Neb. 85, 927 N.W.2d 37 (2019). Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance. *Id*. The burden of proof rests with the party claiming that property is nonmarital. *Id.*

Phillip contends that the Arizona condominium was not marital property, as he had purchased it prior to the marriage and only conveyed it to Andrea for estate planning purposes. He

suggests that only the payments on the mortgage made during the marriage should be considered marital property.

In *Sellers v. Sellers*, 294 Neb. 346, 882 N.W.2d 705 (2016), the Nebraska Supreme Court concluded that a transfer of an LLC from husband to wife was a gift, despite contentions that it was only transferred for estate planning purposes. In reaching this conclusion, the court noted the testimonial evidence that the wife would not have married the husband without the guarantee of financial security from the transfer, together with references in the transfer documents describing the transfers as a gift. Here, the Arizona condominium was first titled in Phillip's name but shortly after the marriage the property was refinanced and titled in both Phillip's and Andrea's names. In 2012, Andrea deeded her interest back to Phillip upon another refinancing solely in his name. However, in 2016, Phillip again transferred the property to both he and Andrea. While there was testimony from both parties that this transfer was for estate planning or probate purposes, there was additional testimony from Andrea that this property was always treated as part of their marital estate and part of their retirement planning. In our review, we can find no abuse of discretion in the court's determination that Phillip did not meet his burden of proving that the Arizona property should be considered nonmarital.

Phillip alternatively argues that he should be credited with the downpayment, mortgage payments, and improvements he claimed were made on the Arizona property prior to the marriage. In *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004), the Nebraska Supreme Court held that a husband was entitled to a credit when he provided documentary evidence to establish that he contributed a downpayment on a home made from premarital funds, despite the fact that the property became jointly titled during the marriage. However, while documentary evidence may be more persuasive, it is not absolutely required. See *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019). In *Onstot v Onstot*, 298 Neb. 897, 906 N.W.2d 300 (2018), the Nebraska Supreme Court affirmed the trial court's decision to not grant the husband credit for the value of a premarital house at the time of marriage, noting that the husband did not testify or supply any documentation to establish the net value of the house at the time of marriage. In *Quinn v. Quinn*, 13 Neb. App 155, 689 N.W.2d 605 (2004), this court held that a spouse was not entitled to a credit for improvements made to a property when there was no evidence that those improvements significantly increased the value of the property.

Here, Phillip testified that he thought he the purchase price of the condominium was $145,000. Phillip testified that he made a downpayment on the property, but could not remember the exact amount and testified that he thinks it would have been "about $14,500" but that it may have been less. Phillip did not testify about the value of the condominium at the time of the parties' marriage, which was approximately 7 years following its purchase. The only documentary evidence submitted by Phillip was a loan history document showing the beginning loan balance and payments made on the loan. This document had handwritten notations purporting to show a purchase price of $139,000, a downpayment of $20,000, and improvements of $12,000. No testimony was given as to the origin or bases of these handwritten notes. In sum, the record before us is insufficient to determine the amount of premarital equity in the Arizona property or to set aside any credit for a downpayment or improvements to the property before the marriage.

The trial court did not abuse its discretion in concluding that the Arizona condominium was marital property or in failing to give Phillip credit for any premarital equity in, or any downpayment, mortgage payments, and improvements made to the property.

## VALUATION OF MARITAL HOME

Phillip also contends the district court erred in determining the value of the marital home. A resident owner who is familiar with his or her property and knows its worth is permitted to testify as to its value without further foundation; this principle rests upon the owner's familiarity with the property's characteristics, its actual and potential uses, and the owner's experience in dealing with it. *Cain v. Custer Cty. Bd. of Equal.*, 298 Neb. 834, 906 N.W.2d 285 (2018). When an independent appraiser using professionally approved methods of mass appraisal certifies that an appraisal was performed according to professional standards, the appraisal is considered competent evidence under Nebraska law. *Id*.

In this case, conflicting evidence was submitted regarding the value of the marital home. Both Andrea and Phillip testified to their valuations based, in part, on their familiarity of the home as owners. Andrea also based her valuation on information from the Lancaster County assessor and two realtors. Phillip used information from Zillow and a private appraiser, who performed an exterior only appraisal. The court adopted Andrea's valuation of $241,000 as opposed to Phillip's valuation of $280,000. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *White v. White,* 304 Neb. 945, 937 N.W.2d 838 (2020). We cannot say that the trial court erred in choosing Andrea's valuation over Phillip's.

In her cross-appeal, Andrea contends that the trial court erred on receiving Phillip's appraisal into evidence. We need not address this argument because we determined the trial court did not err in choosing to use Andrea's valuation over Phillip's in determining the value of the marital home. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Picard v. P & C Group 1*, 306 Neb. 292, 945 N.W.2d 183 (2020).

## EQUALIZATION JUDGMENT

Phillip contends that because the court erred in classifying the Arizona property as marital and in undervaluing the marital residence, the trial court also erred in failing to award an equalization judgment to him. Because we find that the trial did not err in the determination, valuation, and division of the marital property, we need not address this contention. See *Picard v. P & C Group 1, supra.*

## CHILD SUPPORT

Phillip assigns that the trial court erred in the assessment of child support against him. Specifically, Phillip contends that it was error for the trial court to base his child support on his earning capacity rather than his current actual income. According to the Nebraska Child Support guidelines, "If applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities." Neb. Ct. R. § 4-204 (rev. 2016). Child support may be based on a parent's earning

capacity when a parent voluntarily leaves employment and a reduction in that parent's support obligation would seriously impair the needs of the children. *Claborn v. Claborn*, 267 Neb. 201, 673 N.W.2d 533 (2004); *Henke v. Guerrero*, 13 Neb. App 337, 692 N.W.2d 762 (2005). In this case, Phillip voluntarily resigned from his position at Fiserv in lieu of termination, and has experienced a decrease in income while searching for a comparable position. Although Phillip worked in sales at Fiserv, he previously held jobs in banking and finance which were both more lucrative positions than his current job as a rideshare driver. Further, because Phillip was awarded the Arizona condominium, he is able to earn some income from that property.

In *Grahovac v. Grahovac,* 12 Neb. App. 585, 680 N.W.2d 616 (2004), this court held that a district court erred when it modified a child support obligation after the appellee chose to resign after being given the opportunity to either resign or be terminated. We concluded that the appellee's decision to resign constituted a "voluntary wastage and dissipation of his talents and assets" and therefore was not cause for reduction in child support. *Id.* at 591, 680 N.W.2d at 622.

On the other hand, in *Henke v. Guerrero, supra*, this court held that the district court did not abuse its discretion in refusing to impute a higher earning capacity for the appellee, despite resigning from a higher wage job, because it was not realistic to assume he could be rehired or find similar employment at that earning capacity. In that case, the district court found that the appellee made every effort to obtain employment at a higher earning capacity by continuing to search for better work after applying to over 20 places. *Id*.

Here, Phillip chose to voluntarily resign his position, albeit in lieu of termination from his sales position. Although Phillip had been unsuccessful in finding comparable employment by the time of trial, there was no evidence to suggest that it was not realistic for him to find similar employment in the future. Phillip's job loss had only lasted approximately 4 months by the conclusion of the trial, and he remained hopeful that he would secure similar employment. On this record, we cannot say that the district court abused its discretion in using Phillip's earning capacity in setting his child support obligation.

SPOUSAL SUPPORT

Phillip contends that the trial court erred in assessing temporary spousal support against him. On cross-appeal, Andrea asserts that the court erred in failing to award her permanent alimony.

In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018). In addition, a court should consider the income and earning capacity of each party and the general equities of the situation. *Id*. The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Id*. In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Id*. An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record. *Id*.

Phillip contends that the temporary spousal support award was unfair because he lost his job and was unable to make the payments after meeting his child support obligation and his living expenses. The temporary spousal support order was entered in April 2018, to commence May 1, when Phillip was still employed at Fiserv. In October, Phillip sought a reduction in his temporary child support and spousal support obligations, citing his job loss. The trial court did not rule on this motion prior to the trial which was held in January and February 2019. In the decree, filed August 23, 2019, no alimony was ordered to be paid by either party and the court did not address Phillip's request to reduce the temporary spousal support, although it ordered that any previous sums due remained owing if unpaid and that the temporary orders terminated upon entry of the decree. Thus, Phillip's temporary spousal support obligation continued for approximately 10 months following his motion, amounting to approximately $9,000. Although Phillip recited in his motion that the trial court indicated it would address his motion at trial, there is nothing in our record to support that contention. The record does not show that Phillip requested a ruling on his motion to reduce temporary spousal support, but he did testify at trial that he was asking the court to suspend this obligation beginning November 1, 2018. The court did not grant this request in the decree. And, the district court denied Phillip's motion to alter or amend the decree, which motion raised the court's alleged failure to consider the issues raised in Phillip's motion to temporarily reduce child support and alimony.

Given Phillip's earning capacity and the court's denial of Andrea's request for permanent alimony, which we address below, the trial court did not err in refusing to reduce the temporary spousal support.

In her cross-appeal, Andrea argues that the trial court erred in its failure to incorporate an alimony award as part of the decree. We disagree. Phillip is required to pay a significant amount of child support, and at least at the time of trial, Andrea's actual income exceeded that of Phillip. We cannot say Andrea is being deprived of a substantial right or just result by the trial court's decision not to include the permanent alimony in the decree. Thus, the trial court did not abuse its discretion in failing to award alimony to Andrea.

CONCLUSION

For the above stated reasons, we affirm the decision of the trial court.

AFFIRMED.